UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHEUNG WAN GALLERY LIMITED,<br><br>*Plaintiff*,<br><br>- against -<br><br>MICHAEL KAGAN,<br><br>*Defendant*. | ECF Case<br><br>CIVIL ACTION NO.<br><br>**COMPLAINT** |

Plaintiff Sheung Wan Gallery Limited ("SWG"), by its attorneys, Pryor Cashman LLP, as and for its Complaint against Defendant Michael Kagan ("Defendant"), alleges as follows:

**NATURE OF THE ACTION**

1. This action seeks to enforce the terms of a "pre-purchase agreement" pursuant to which Defendant agreed to exclusively work with SWG and sell 70 unique works of art to SWG over a two-year period in exchange for a payment of $1.1 million. Despite having received the $1.1 million from SWG, Defendant has provided SWG with less than 20 artworks and has refused to provide SWG with the balance of the artworks. Despite claiming that he was not able to create the required number of artworks, Defendant created and sold his artworks through various third parties in flagrant breach of his contractual obligations to SWG during the two-year term of the parties' agreement. As set forth below, Defendant has previously been sued for breaching his contractual obligations to his agents, and his purported inability to create the required artworks is false and part of a pattern of misrepresentations that Defendant tells when it suits him to try to get out of his contractual obligations in the hope of selling his artworks for higher prices—which resulted from the efforts undertaken by SWG to enhance the market for Defendant's art.

**PARTIES AND JURISDICTION**

2. Plaintiff is a company incorporated in Hong Kong with a registered office at Unit B, 17/F, United Centre, 95 Queensway, Admiralty, Hong Kong.

3. On information and belief, Defendant resides in the State of New York.

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, due to diversity of the parties and because the amount in controversy exceeds $75,000.00.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claims occurred in the Southern District of New York.

**FACTS**

6. SWG, doing business as "Over the Influence," is an art gallery with locations in Hong Kong, Los Angeles, Bangkok and Paris.

7. SWG specializes in working with up-and-coming contemporary artists to help grow their markets.

8. Once SWG has identified such an artist, it typically enters into an agreement with that artist pursuant to which SWG agrees to represent and promote the artist in order to enhance the value of the artist's work.

9. Rather than, as many art galleries do, take and offer an artist's artwork on consignment, in which case a buyer may or may not be found, SWG will often purchase an agreed upon number of artworks from the artist, thereby ensuring that the artist has a guaranteed income stream, whether or not SWG is able to find purchasers for the artworks. SWG calls these types of agreements "pre-purchase agreements."

10. In so doing, SWG both takes the financial risk that it will be unable to sell the artworks that it has purchased and is incentivized to build the artist's market so that it may over

the course of several years, including after the pre-purchase agreement has expired, successfully sell the artworks that it has purchased at a profit.

11.     SWG, to protect the artist's market, will also agree to the minimum prices that it expects to ask for the artworks which it has acquired to ensure the artist understands the lowest "return on investment" that SWG would earn in the event the artworks are sold at the minimum prices set forth in the representation agreement.

### The Negotiation of the Pre-Purchase Agreement

12.     In March 2019, following SWG's exhibition of several of Defendant's works at various art fairs, Defendant approached SWG and asked if it would be willing to enter into a pre-purchase agreement with him.

13.     Defendant informed SWG that he was interested in entering into this type of agreement as it would allow him to focus on his painting, given that his income stream would be assured.

14.     SWG invited Defendant to a meeting in Hong Kong during the Art Basel art fair in March 2019.

15.     SWG and Defendant met in Hong Kong on or about March 28, 2019 to discuss the terms of a pre-purchase agreement.

16.     On April 10, 2019, Defendant contacted SWG by email and asked for a draft of a pre-purchase agreement.

17.     On April 10, 2019, SWG sent Defendant a draft of a pre-purchase agreement.

18.     The draft pre-purchase agreement required Defendant to provide SWG with 30 unique paintings per year over a two-year period in exchange for a total payment of $900,000.

19. On April 20, 2019, Defendant requested that SWG increase the number of paintings that he would be required to provide per year from the 30 paintings that SWG had proposed to 33 to 35 paintings.

20. In an email to SWG dated April 20, 2019, Defendant stated that "33-35 paintings would be a better number."

21. In exchange for the increase in the number of paintings that Defendant would be required to produce, Defendant proposed that the total amount payable to him under the pre-purchase agreement be increased from $900,000 to $1,200,000.

22. Defendant never expressed any reservation, concern, or doubt to SWG with respect to his ability to produce 33 to 35 unique paintings per year.

23. To the contrary, Defendant expressly negotiated to be obligated to produce a larger number of works than SWG initially proposed in the draft pre-purchase agreement.

24. On or about May 2, 2019, SWG spoke with Defendant and agreed to Defendant's request that the number of paintings that he would be required to produce be increased from the 30 paintings initially proposed by SWG to the 35 paintings suggested by Defendant.

25. SWG and Defendant also agreed that the total amount payable to Defendant under the pre-purchase agreement would be increased to $1,050,000.

26. During the May 2, 2019 telephone call, Defendant never expressed any reservation, concern, or doubt to SWG with respect to his ability to produce 35 paintings per year.

27. Following the May 2, 2019 telephone call, SWG sent an email to Defendant confirming that SWG was willing to increase the number of paintings that Defendant would be required to produce from 30 to 35 each year and that the total amount payable to Defendant under the pre-payment agreement would be increased to $1,050,000.

28. In the same email, SWG also proposed that its agreement with Defendant would commence on October 1, 2019.

29. On May 3, 2019, in an email to SWG, Defendant confirmed that he was "all set on the number of paintings of 35," but again asked that the total amount payable to him be increased, proposing $1,100,000 rather than the $1,050,000 that he had agreed to the previous day.

30. In his May 3rd email to SWG, Defendant, anxious for SWG's payments to him to start as soon as possible, proposed that his agreement with SWG commence as of July 1, 2019 rather than October 1, 2019.

31. In his May 3rd email to SWG, Defendant again reassured SWG that he would be able to produce 35 paintings per year, stating that the pre-payment agreement would allow him to "focus[ ] on painting and take my career to the next level with focus and no distraction."

32. In his May 3rd email to SWG, Defendant added that "I have always had a clear vision of my career and I have been able to hit my marks as it progresses."

33. In his May 3rd email, Defendant never expressed any reservation, concern, or doubt to SWG with respect to his ability to produce 35 paintings per year.

34. On or about May 22, 2019, SWG spoke with Defendant and confirmed that SWG was willing to increase the total amount payable to Defendant under the pre-purchase agreement to $1,100,000 in exchange for his commitment to provide SWG with 35 paintings each year.

35. SWG also agreed that the agreement would commence as of July 1, 2019 as Defendant had requested.

36. SWG confirmed the points discussed with Defendant on May 22, 2019, in an email of the same date and agreed to provide Defendant with an updated draft of the agreement reflecting these terms.

37. On June 4, 2019, Defendant sent an email to SWG asking for a copy of the draft pre-purchase agreement.

38. On June 5, 2019, SWG sent Defendant an updated draft of the pre-purchase agreement.

39. Defendant signed the pre-purchase agreement on June 14, 2019 (the "Pre-Purchase Agreement").

40. The Pre-Purchase Agreement concerned the promotion and sale of artworks created by Defendant (the "Works").

41. Schedule 2 of the Pre-Purchase Agreement required Defendant to provide SWG with 35 paintings of varying sizes during each year of the two-year contractual term (the "Agreed Upon Annual Production").

42. Schedule 3 of the Pre-Purchase Agreement set forth the payment schedule for SWG's purchase of the Works in accordance with the Agreed Upon Annual Production.

43. Pursuant to Clause 3.1 of the Pre-Purchase Agreement, Defendant appointed SWG as "the sole and exclusive agent and representative of [Defendant] with respect to Works created by [Defendant], and consigned/prepaid under this [Pre-Purchase] Agreement…."

44. Pursuant to Clause 8.3.4 of the Pre-Purchase Agreement, Defendant agreed that he would not "exhibit or sell any Work, whether from the [Defendant's] studio or otherwise, to purchasers, private or public, without prior consent of [SWG]."

45. Pursuant to Clause 15.3 of the Pre-Purchase Agreement, Defendant represented and warranted to SWG that the "entry into and performance by [Defendant] of this [Pre-Purchase] Agreement to which it is a party are within its powers."

46. SWG agreed to pay Defendant $1,100,000 during the term of the Pre-Purchase Agreement for the 70 Works that Defendant agreed to provide SWG during the term of the Pre-Purchase Agreement.

### Defendant Requests the Amendment of the Pre-Purchase Agreement

47. During the first year of the Pre-Purchase Agreement, Defendant had provided SWG with only 2 of the 35 Works that he was obligated to produce under that agreement.

48. Despite having failed to provide SWG with the requisite number of Works, in July of 2020, Defendant requested that SWG amend the Pre-Purchase Agreement so as to allow Defendant to keep three paintings per year for his own use.

49. In making this request, Defendant never expressed any reservation, concern, or doubt to SWG as to his ability to produce the number of Works that he was required to produce under the Pre-Purchase Agreement.

50. SWG agreed to allow Defendant to retain for himself three works, below 40" x 40" in size, per year.

51. Defendant was allowed to use these works as he wished for the goal of furthering his career, but was obligated to inform SWG in writing prior to any donation or sale of these works.

### Defendant Fails to Provide SWG with the Required Number of Works

52. Defendant failed to provide SWG with the number of Works required under the Pre-Purchase Agreement.

53. Despite Defendant's failure to comply with his contractual obligations, SWG provided substantial support to Defendant, including, but not limited to, hiring an artist liaison in New York to be in close contact with certain SWG artists, including Defendant; offering him shows at its galleries in Hong Kong and Los Angeles; offering Defendant a solo presentation at a

major art fair in Chicago and group presentations at other art fairs; and providing an additional $40,000 of financial support (in excess of what was paid to Defendant under the Pre-Purchase Agreement) for Defendant's first museum show at the Virginia Museum of Contemporary Art.

54. SWG's support of Defendant's career and artistic practice substantially increased the value of the Works (and all of Defendant's artistic output) during the term of the Pre-Purchase Agreement and thereafter.

55. From July 2019 to December 2020, Defendant offered to provide SWG with a selection of hand painted artworks from either his "Astronaut" series or his "Formula 1 Driver" series, of various sizes. SWG accepted all of the proposed hand-painted artworks, and those Works were then successfully placed by SWG with collectors.

56. Defendant understood what the subject matter, materials, and quality of the Works were expected to be under the Pre-Purchase Agreement.

57. SWG, in consultation and agreement with Defendant, scheduled a solo exhibition of 24 works of Defendant's in the two exhibition spaces in SWG's Hong Kong gallery from March 28, 2021 to May 8, 2021.

58. The solo exhibition was scheduled to take place, in part, during Art Basel Hong Kong, one of the largest art fairs in the world, which is the premier time in Hong Kong for an art exhibition.

59. Defendant confirmed to SWG that he would provide 24 works for the exhibition.

60. Before the exhibition was scheduled to open, SWG was becoming increasingly concerned as to whether Defendant would provide the promised 24 works.

61. SWG sought assurances that Defendant would provide the promised 24 works.

62. Defendant provided assurances to SWG that he would provide the promised 24 works.

63. However, on February 6, 2021, Defendant informed SWG that he would only be able to provide 13 works, including 2 large scale works.

64. Defendant also informed SWG that he would only be able to fill one of the two gallery spaces.

65. Defendant subsequently informed SWG that he would only provide 10 works.

66. Defendant ultimately produced only 7 works of small and medium sizes for the exhibition.

67. In an email dated June 30, 2021, Defendant stated that the current retail prices of his works were as follows:

- $125,000 for Works measuring 96" x 72";
- $110,000 for Works measuring 72" x 54";
- $80,000 for Works measuring 60" x 45"; and
- $50,000 for Works measuring 40" x 30."

68. The aggregate retail value of the Works that Defendant failed to provide SWG was $5,075,000 as of June 30, 2021.

69. Upon information and belief, the value of the Works that Defendant failed to provide SWG has further increased since June 30, 2021.

**The Almine Rech Exhibition**

70. In or about January 2021, Defendant informed SWG that he was planning on exhibiting works with the Almine Rech Gallery.

9

71. SWG informed Defendant that it objected to his providing any works at all to Almine Rech in light of his failure to have provided SWG with the required number of Works. SWG agreed, however, to discuss with Almine Rech the possibility of SWG consigning works to them.

72. Defendant, however, never arranged for Almine Rech to contact SWG directly.

73. Instead, Defendant consigned several works to Almine Rech through yet another New York art gallery.

74. The number of works that Defendant consigned was in excess of the three works he was entitled to provide Almine Rech or any other art gallery without SWG's permission.

75. Defendant's consignment of Works to Almine Rech violated the terms of the Pre-Purchase Agreement.

76. Upon information and belief, Almine Rech sold one or more of Defendant's Works.

### The Print Editions

77. Paragraph 14 of the Pre-Purchase Agreement provided that SWG and Defendant would "work together in good faith to have a coherent art print strategy, and it is expected that a minimum of 4 prints will be released each 12-calendar months."

78. Paragraph 14.1.2 provided that the "proceeds of sales will be split 65% to [SWG] and 35% to the Artist.

79. In accordance with Paragraph 14 of the Pre-Purchase Agreement, and after receiving approval from Defendant, SWG retained a print publisher and had a print edition created at SWG's expense.

80. Although the print edition was produced by SWG, Defendant has refused to sign the prints, rendering them largely worthless.

81. As a result of Defendant's breach of his contractual obligations, SWG has incurred damages in excess of $130,000.

82. In addition, Defendant failed to work in good faith with SWG to release a minimum of "4 prints" per year during the term of the Pre-Purchase Agreement.

83. As a result of Defendant's breach of this contractual obligation, SWG has suffered damages in excess of $390,000.

### The Maki Contract

84. In 2020, Defendant informed SWG that he had been having discussions with a Japanese collector he referred to as "Maki."

85. Defendant's discussions with Maki involved the sale to Maki of both prints and several paintings.

86. In light of SWG's exclusivity rights in the Pre-Purchase Agreement, Defendant could not enter into a transaction with Maki without SWG's consent.

87. Following a series of discussions with Defendant, SWG agreed that Defendant could enter into an arrangement with Maki pursuant to which SWG would be entitled to a payment by Defendant of $165,000 and, in addition, 50% of the artist's proofs from the print edition made for Maki.

88. Upon information and belief, Defendant entered into an agreement with Maki pursuant to which he was paid $855,750.

89. Defendant, however, has not received the agreed upon payment of $165,000 or the artist proofs to which it was entitled, the retail value of which is a minimum of $228,750.

90. Upon information and belief, 115 artist's proofs were to be created pursuant to the Maki agreement.

11

91. Defendant's actions constitute a breach of the exclusivity provisions of the Pre-Purchase Agreement.

**DEFENDANT HAS BREACHED THE PRE-PURCHASE AGREEMENT**

92. SWG paid Defendant the $1,100,000 required under the Pre-Purchase Agreement.

93. To date, Defendant has provided SWG with only approximately 18 of the 70 Works that it agreed to produce and sell to SWG during the term of the Pre-Purchase Agreement.

94. Defendant has failed—without any legal or other justification—to provide SWG with the remaining 53 Works that he agreed to sell to SWG under the Pre-Purchase Agreement.

95. Defendant, having failed to provide SWG with the number of Works required under the Pre-Purchase Agreement, has breached that agreement.

96. Defendant has claimed to SWG and its representatives that he is unable to create the remaining Works owed to SWG.

97. On information and belief, Defendant has created artworks during the term of the Pre-Purchase Agreement that he did not release to SWG.

98. On information and belief, Defendant has consigned Works through third parties during the term of the Pre-Purchase Agreement.

99. On information and belief, Defendant has sold Works through third parties during the term of the Pre-Purchase Agreement.

100. On information and belief, Defendant has sold Works directly to buyers during the term of the Pre-Purchase Agreement.

101. Unbeknownst to SWG, this is not the first time that Defendant has failed to comply with his contractual obligations to an art gallery.

102. In 2017, Defendant was sued by the Joshua Liner Gallery LLC in New York Supreme Court, Index No. 656849/2017, for, among other misconduct, "Defendant's (a) refusal to honor his contractual obligations to the Gallery, including his fraudulent concealment of sales of paintings directly through his studio in violation of his agreement, (b) failure to create and deliver a painting to the Gallery, as he had agreed to do in consideration for certain sale goals having been achieved by the Gallery…."

103. As demonstrated by the earlier lawsuit, Defendant's claim that he is unable to create the remaining Works is false, and is a product of Defendant's consignment of Works to third parties that belong to, and are legally owned by, SWG.

104. Since each painting by Defendant is unique and SWG intend to hold the Works and sell them through a deliberate process over many years, the lost profits that SWG has suffered have further increased as Defendant's market has risen.

105. SWG has suffered damages in amount to be determined at trial.

### FIRST CAUSE OF ACTION
### (Breach of Contract)

106. SWG repeats and realleges the allegations set forth in Paragraphs 1 through 105 above.

107. SWG and Defendant were parties to the Pre-Purchase Agreement.

108. The Pre-Purchase Agreement required Defendant to produce 70 Works that would be owned by SWG in exchange for the $1,100,000 payment made by SWG to Defendant during the term of the agreement.

109. SWG and Defendant agreed to all of the terms of the Pre-Purchase Agreement.

110. SWG has performed all of its obligations under the Pre-Purchase Agreement, including payment of $1,100,000 for the 70 works that Defendant agreed to sell to SWG during the term of the Pre-Purchase Agreement.

111. Despite receipt of payment for the 70 Works, Defendant has provided SWG with only approximately 18 Works.

112. Defendant failed to provide the 70 Works that it agreed to sell to SWG under the terms of the Pre-Purchase Agreement.

113. Defendant created, but failed to provide to SWG, certain artworks during the term of the Pre-Purchase Agreement.

114. Defendant consigned certain artworks created by Defendant to third parties during the term of the Pre-Purchase Agreement.

115. Defendant sold certain artworks created by Defendant through third parties during the term of the Pre-Purchase Agreement.

116. Defendant sold certain artworks created by Defendant directly to buyers during the term of the Pre-Purchase Agreement.

117. By failing to provide the 70 Works that it agreed to sell to SWG, Defendant has breached the terms of the Pre-Purchase Agreement.

118. By creating, but failing to provide to SWG, certain artworks during the term of the Pre-Purchase Agreement, Defendant has breached the terms of the Pre-Purchase Agreement.

119. By consigning certain artworks created by Defendant to third parties during the term of the Pre-Purchase Agreement, Defendant has breached the terms of Pre-Purchase Agreement.

120. By selling certain artworks created by Defendant through third parties during the term of the Pre-Purchase Agreement, Defendant has breached the terms of the Pre-Purchase Agreement.

121. By selling certain artworks created by Defendant directly to buyers during the term of the Pre-Purchase Agreement, Defendant has breached the terms of the Pre-Purchase Agreement.

122. By refusing to sign the print edition produced by SWG, and by failing to work in good faith with SWG to release a minimum of "4 prints" per year during the term of the Pre-Purchase Agreement, Defendant has breached the terms of the Pre-Purchase Agreement.

123. SWG has suffered damages as a result of Defendant's breaches in amount to be determined at trial.

### SECOND CAUSE OF ACTION
### (Unjust Enrichment – In the Alternative)

124. SWG repeats and realleges the allegations set forth in Paragraphs 1 through 123 above.

125. SWG paid Defendant $1,100,000 with the understanding that Defendant would use the funds to produce 70 Works that would be owned by SWG.

126. Defendant accepted and received the $1,100,000 from SWG.

127. SWG and Defendant were in an special relationship by virtue of the understanding that SWG would be Defendant's exclusive agent for artwork sales during this period.

128. Upon information and belief, Defendant produced Works as a result of the $1,100,000 that Defendant received from SWG, but did not deliver the Works to SWG.

129. Upon information and belief, Defendant sold certain Works that were produced as a result of the $1,100,000 that Defendant received from SWG through other art galleries, including Almine Rech and another New York art gallery.

130. By accepting the $1,100,000 from SWG, and selling the Works though other art galleries, Defendant has been unjustly enriched at the expense of SWG.

131. It is against equity and good conscience to permit Defendant to retain the $1,100,000 plus any sale proceeds from the sale of any Works sold through other art galleries.

132. By reason of the foregoing, SWG has suffered damages and is entitled to judgment against Defendant, for damages in amount to be determined at trial.

**WHEREFORE,** SWG demands judgment in its favor awarding SWG:

(a) compensatory damages in an amount to be determined at trial, but in no event less than $5,000,000 representing the value that SWG would have received from the sale of the Works if Defendant had delivered them to SWG in accordance with the Pre-Purchase Agreement;

(b) compensatory damages in an amount to be determined at trial, but in no event less than $520,000 caused by Defendant's breach of the Paragraph 14 of the Pre-Purchase Agreement.

(c) compensatory damages in an amount to be determined at trial, but in no event less than $393,750 caused by Defendant's breach of the Maki contract;

(d) disgorgement of the value of the Works that Defendant produced but did not deliver to SWG;

(e) an order (a) enjoining Defendant from delivering, transferring, or otherwise selling works of fine art created by Defendant to any art merchant or other third-party until Defendant has satisfied any judgment for compensatory damages that the Court awards to SWG, and (b) requiring Defendant to turnover such Works as SWG is entitled to under the Pre-Purchase Agreement to the extent such Works already exist;

(f) costs and disbursements in connection with this action;

(g) its attorneys' fees; and

(h) such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: New York, New York
       2023-March-24

                                     **PRYOR CASHMAN LLP**

By:    */s/ Paul Cossu*
Paul Cossu
7 Times Square
New York, New York 10036
212-421-4100

*Attorneys for Plaintiff*
*Sheung Wan Gallery Limited*